Argued May 16; affirmed June 6, 1939

# LAKESHORE GARDENS DRAINAGE DISTRICT ET AL. *v.* CALIFORNIA-OREGON POWER CO.

(90 P. (2d) 1038)

In Banc.

*M. B. Plant*, of San Francisco, Calif. (R. C. Groesbeck, of Klamath Falls, and Brobeck, Phleger & Harrison, of San Francisco, Calif., on the brief), for appellant.

*Edward J. Clark* and *Arthur M. Geary*, both of Portland (J. H. Carnahan, of Klamath Falls, on the brief), for respondents.

KELLY, J. On February 24, 1917, The California-Oregon Power Company entered into an agreement with the United States of America wherein it was agreed the power company should be permitted to construct a dam on Link river and to control and regulate the level of Klamath lake between the elevations of 4,143.3 feet and 4,137 feet above sea level. Thereafter the power company constructed a crib-dam which was completed in 1919. It then began the construction of a permanent dam.

That contract required the power company to make satisfactory adjustments at its own expense in regard

to all interests which should be affected by the lowering and raising of the waters of the lake below or above the normal fluctuations while in a state of nature.

On January 28, 1919, the contract, just mentioned, was modified to mention specifically and authorize the blasting out of a reef above the outtake of the main canal as well as the building of the dam.

On August 6, 1919, certain owners of land adjacent to Upper Klamath lake instituted a suit in the District Court of the United States for the District of Oregon, to enjoin the maintenance of the crib-dam and the construction of the permanent dam. The filing of this suit evoked a further modifying agreement with the United States dated April 27, 1920, wherein the pendency of the suit was referred to as a cause for enlarging the time within which the power company should do its construction work.

Thereafter, the power company and the landowners entered into negotiations looking toward an agreement which would protect the interests of the parties pending determination of the suit. These negotiations resulted in the execution on March 5, 1920, of a temporary agreement by the terms of which the power company was to be allowed to maintain its crib-dam for the remainder of the year 1920, and was to hold the landowners harmless against all damages, which might ensue during the calendar year of 1920, to the dikes, levees and lands to the complainants as a result of washing, flooding or inundating of said dikes, levees, or diked lands.

After executing the temporary agreement, the parties entered into further negotiations looking toward a permanent settlement of their difficulties. Pursuant to these later negotiations, a permanent agreement was

executed under date of July 19, 1920, and is the agreement here involved.

In this last mentioned agreement, the landowners are designated as complainants and the power company as respondent.

The portions of said agreement pertinent to the issue herein are paragraphs II, III and IV thereof. They are as follows:

### "II

"That respondent shall have the right immediately or at any time hereafter to replace flash boards and control boards in its said dam, and to construct a permanent dam in Link River, and to maintain same therein, and thus control the storage of water in Upper Klamath Lake as it may deem necessary; provided, however, that the water level shall not be maintained at an elevation exceeding 4143.3 or at a lower level than 4137—in other words, in accordance with contract entered into by respondent and United States of America.

### III

Respondent, in consideration of this stipulation, agrees to protect the dikes, levees, and lands hereinafter described against the rising of the waters of Upper Klamath Lake as herein contemplated, and to protect and hold complainants harmless from all damage to the dikes, levees and lands (including crops thereon) described as Caledonia, Wocus, Little Wocus and Wilson properties on said Upper Klamath Lake resulting from flooding, washing, or inundating the same. The word 'damage' as used in this stipulation shall be construed to mean only such damage as may arise, either directly or indirectly, from the control of said lake by respondent.

### IV

Respondent agrees to take prompt and all necessary steps to prevent damage when imminent, and com-

plainants agree to notify respondent promptly of threatened or anticipated damage coming within their observation, so that respondent may take the necessary action to prevent same, but failure so to notify will not release respondent from obligations assumed under this stipulation, and complainants agree that respondents shall have the right to enter upon the properties herein mentioned for the purpose of repairing or preventing damage.''

The appealing defendant herein is the successor in interest of The California-Oregon Power Company, the corporation, which executed the agreements hereinabove mentioned and which was the respondent in said injunction suit.

We are concerned only with the question whether the appealing defendant should be held liable to the adjacent landowners under the contract or stipulation of July 19, 1920, for damages caused by lowering as well as raising the water levels of Upper Klamath Lake from the elevation at which those levees would be in a state of nature.

Plaintiffs urge that a proper construction of the concluding sentence in paragraph III of said agreement results in the conclusion that the defendant should be held to be liable for the damages caused by lowering said water levels below their natural elevation. For clarity, we repeat the quotation of such concluding sentence of said paragraph III:

''The word 'damage' as used in this stipulation shall be construed to mean only such damage as may arise, either directly or indirectly, from the control of said lake by respondent.''

■ It is argued that because paragraph II of said stipulation deals with the right of the power company

to lower as well as raise the water level of said lake, the quoted sentence in said stipulation, which purports to limit the meaning of the word, "damage", has the effect of including within the damages recoverable under said stipulation those damages which may arise because of lowering said water levels either directly or indirectly by the manner in which said power company may control said lake. We are unable to concur in such construction.

■ The language of section III of said stipulation deals only with "the rising of the waters" and the damage "resulting from flooding, washing or inundating". The stipulation deals with no other character of damage. We think that the final sentence of said paragraph III of said stipulation further restricts the recoverable damage, resulting from flooding, washing or inundating, to the damage of that character which shall arise directly or indirectly from the control of said lake by respondent; and thereby excludes damage even though resulting from flooding, washing or inundating, which was not caused by defendant's control of said lake.

It is urged by plaintiffs that, because of the final phrase in paragraph II of said stipulation, a proper construction of said final sentence in paragraph II thereof will include within the damages recoverable under said stipulation those, which arise by lowering the waters of said lake.

The final clause in said paragraph II is:

"in other words in accordance with contract entered into by respondent and United States of America."

Said paragraph II does not contain the term, damage, or make any reference thereto. The purpose of

said paragraph is to grant to the power company the right to replace flash boards and control boards in its dam, to construct a permanent dam, to control the storage of water in Upper Klamath Lake at an elevation not higher than 4143.3 feet nor lower than 4137 feet above sea level. It will be noted that the term sea level is not employed in said paragraph II. The final clause in said paragraph makes reference to the government contract which does employ said term. We think that this final clause has no other significance than that.

Plaintiffs argue that, because the government agreement of February 24, 1917, required the power company to make satisfactory adjustments at its own expense in regard to all interests which should be affected by the lowering and raising of the waters of the lake below or above the normal fluctuations while in a state of nature, and the final clause of paragraph II of the stipulation in suit in fixing the maximum and minimum levels at which the power company had a right to maintain the water of said lake used the quoted term "in other words in accordance with contract entered into by respondent and United States of America", we should hold that the power company would be liable for damages caused by lowering the water of said lake below its level in a state of nature. We think that before we could construe the clause in the original government contract of February 24, 1917, which refers to the power company "making satisfactory adjustment", when considered in the light of the reference to said government contract in paragraph II of the stipulation in suit, and the restrictive definition of the term "damage" in the final sentence

of paragraph II of said stipulation, to mean that the power company had thereby become liable for damages caused by lowering said water levels, we would first have to have some agreement or stipulation constituting a "satisfactory adjustment" between the power company and the landowners whereby the power company agreed to hold the landowners harmless from damage caused by lowering the water of said lake below the level which would maintain in a state of nature.

Plaintiffs also urge that a practical construction has been given to the stipulation in suit to the effect that the power company is liable for damages caused by so lowering the water of said lake. There is evidence in the record that in 1930 the water of said lake fell below the natural level thereof and upon complaint being made by Mr. Edward A. Geary, who was then operating the ranch of The Geary Investment Company adjacent to said lake, the power company installed pumps to remedy that situation and again in 1931 and 1934, upon notice, the pumps were restored for a similar purpose. Mr. Stevenson testified to a similar request and to the granting of permission by the power company for him to use the water furnished by the pumps installed for The Geary Investment Company.

There is some evidence tending to show that claims were paid by the power company for damages resulting from seepage at some of the dikes caused by lowering the water.

We are unwilling to give the testimony the effect claimed for it by plaintiffs. The stipulation in suit is not ambiguous and the incidents just mentioned fall short of showing a course at variance with its terms. "Before evidence can be admitted establishing that the

parties placed an interpretation upon their contract the latter must be ambiguous. If the meaning of the contract is plain, the acts of the parties cannot prove a construction contrary to the plain meaning. Williston on Contracts, § 623; Jones Commentaries on Ev. (2d Ed.) § 1560; 22 C. J., Evidence, p. 1180, § 1574." *Coquille M. & T. Co. v. Dollar Co.*, 132 Or. 453, 472, 285 P. 244, 351.

■ It is also urged that to construe the stipulation in suit so that recoverable damages thereon are limited to those sustained by raising the water would be to hold that the landowners released their common law right to protection against lowering without consideration.

We are unable to concur in this view. It is tantamount to saying that the agreement set forth in the stipulation is without a consideration. The compromise and settlement of a suit at law, based upon a disputed claim made in good faith, is a sufficient consideration to support such an agreement. *Holder v. Harris, et al.*, 121 Or. 432, 441, 248 P. 145, 253 P. 869, 870, and authorities there cited.

■ The record is rather replete with testimony as to the relation of the parties to the subject matter, the attempts made to impress their divergent views upon the final agreement and the conditions which impelled the respective parties to urge such view; but the stipulation itself is plain and unambiguous and hence the construction of it should accord with the meaning of the language used therein.

■ For these reasons we hold, and the decree of the circuit court is modified to the effect, that, under the stipulation in suit, the power company cannot be re-

quired to pay damages caused by lowering the water in said lake below the level which it would maintain in a state of nature, unless said water should be lowered below the minimum elevation prescribed in said stipulation, namely, 4137 feet above sea level.

As thus modified, the decree of the circuit court is affirmed.

ROSSMAN and LUSK, JJ., not sitting.